KEN-CRETE PRODUCTS COMPANY, Respondent, v. STATE HIGHWAY COMMISSION and another, Appellants.

*June 1—June 30, 1964.*

For the appellants there was a brief by *Mittelstaed, Heide, Sheldon & Hartley* and *William A. Sheldon,* all of Kenosha, and oral argument by *William A. Sheldon.*

For the respondent there was a brief by *Wickhem, Consigny & Sedor* of Janesville, and *John E. Malloy* of Kenosha, and oral argument by *John C. Wickhem.*

CURRIE, C. J.  The two issues presented by this appeal are:

(1) Did the trial court err in receiving evidence as to the cost of installing an overhead conveyor which allegedly was necessary to maintain the same cost of production in Ken-Crete's plant as existed before condemnation?

(2) Did the trial court err in refusing to take testimony as to whether the jury returned a quotient verdict?

*Receipt of Evidence with Respect to Cost
of Installing Overhead Conveyor.*

As a result of the taking of the .44 acres, Ken-Crete was deprived of the use of this land on which to store piles of sand and gravel used in the manufacture of its concrete blocks. After the taking, Ken-Crete leased some land to the west owned by a railroad company adjoining Ken-Crete's premises, and now its supply of sand and gravel is stored on this leased land. The aggregate is now brought by trucks and dumped there. The concrete-block manufacturing plant is located close to the east boundary of Ken-Crete's property, and other buildings occupy the south portion of its remaining premises, so Ken-Crete had no available land abutting on the highway available for storing sand and gravel, which necessitated the leasing of the railroad premises for such purpose.

Before the taking, a "loader" or elevator carried the sand and gravel up to the hopper where it would be loaded into the machines which manufactured the blocks. One employee operated both the loader and the automatic machinery used in manufacturing the blocks. After the taking, the sand and gravel had to be transported to the manufacturing plant, a distance of approximately 240 feet from where it was stored on the leased land.

Three expert witnesses, Kerr, Williams, and Wolf, all with long experience with concrete-block manufacturing machines, were permitted to testify, over the objection of the condemnors, that the most-economical way of transporting this sand and gravel from the stockpiles on the leased land to the block-manufacturing plant would be by installing an overhead conveyor system. The estimated cost of the overhead conveyor as testified to by the witness, Kerr, was

$43,900. Ken-Crete called two experienced realtors, Bear and Pfennig, to testify to the value of its premises before and after the taking. Bear, in his testimony, stated, that he had consulted with Kerr, Williams, and Wolf in familiarizing himself with the machinery involved and that in his judgment a well-informed buyer would consult with such experts before making a decision regarding the property. Pfennig's testimony made no reference to that of Kerr, Williams, and Wolf.

The condemnors contend it was prejudicial error to admit the testimony of Kerr, Williams, and Wolf with respect to the advisability of installing the overhead conveyor and the cost of such installation. Their principal argument in support of this contention is that such conveyor would constitute a capital improvement for which recovery may not be had under sec. 32.09 (6), Stats.[1]

Under sec. 32.09 (6), Stats., the measure of damages in a condemnation proceeding where there is a severance is the difference between the fair market value of the whole property immediately before the taking and the fair market value of the remainder immediately thereafter. By use of the phrase "and without restriction because of enumeration" found in sec. 32.09 (6), it seems reasonable to conclude that the legislature intended that every element which affects fair market

[1] The pertinent provisions of this statute read:

"In the case of a partial taking, the compensation to be paid by the condemnor shall be determined by deducting from the fair market value of the whole property immediately before the date of evaluation, the fair market value of the remainder immediately after the date of evaluation, assuming the completion of the public improvement and giving effect, without allowance of offset for general benefits, and without restriction because of enumeration but without duplication, to the following items of loss or damage to the property where shown to exist.

". . .

"(e) Damages resulting from actual severance of land including damages resulting from severance of improvements or fixtures and proximity damage to improvements remaining on condemnee's land."

value should be considered. This is in accord with the great weight of authority. See 4 Nichols, Eminent Domain (3d ed. 1962), p. 3 *et seq.,* sec. 12.1, where the author states (p. 4) that, "All elements of value which are inherent in the property merit consideration in the valuation process." The author also states that evidence is admissible that the remainder area is no longer capable of use for a particular purpose or that its purpose or that its facility therefor has been impaired. See 4 Nichols, *supra,* sec. 14.243, and cases cited at note 4, page 580. These principles were approved by this court in *Carazalla v. State* (1955), 269 Wis. 593, 70 N. W. (2d) 208, 71 N. W. (2d) 276 (on rehearing), where the court stated (p. 608b) :

". . . in case of a partial taking of land by eminent domain *any* damages to the remaining land, which results from the use to which the parcel taken is to be devoted, is a proper item to be included in determining the value of the owner's remaining land after the taking." (Emphasis supplied.)

It is conceded that the highest and best use to which Ken-Crete's premises might be devoted at time of taking was a concrete-block manufacturing plant.

The testimony with respect to the advisability and cost of installing the overhead conveyor was not offered by Ken-Crete to establish a separate item of damages, but only as an element to be considered in arriving at the value of the remainder of its property after the taking. The underlying theory is that a prospective purchaser would pay $43,900 less for the premises after the taking than before, if he would have to expend that amount to provide a facility to enable the block-manufacturing plant to continue to operate at the same capacity as before the taking. Under this theory, as borne out by the testimony of Ken-Crete's expert witnesses, the expenditure of this $43,900 would not cause the value

of the remaining premises to exceed the value of the whole premises as they existed before the taking. The jury had the right to accept the testimony which substantiated this theory.

In an analogous situation involving agricultural property, which, because of a partial taking, would require additional fencing in order for the remaining property to be used thereafter in the same fashion, this court, in *Nowaczyk v. Marathon County* (1931), 205 Wis. 536, 238 N. W. 383, held that the cost of additional fencing was a proper element to be considered in determining the after value of the remaining property. In *Nowaczyk, supra,* the court made the following pertinent statements (p. 541) :

" '. . . the necessity of fences must be considered in its tendency to minimize the value of the farm, rather than as an independent and separately itemized element of damages. The question is not what the particular fence desired by appellees at this time may cost, but rather the underlying inquiry is whether the farm as a whole, in view of the purposes for which it is adapted, will be minimized in value because extra fencing may be required and such fence might need to be repaired, maintained, and replaced.'

"This is doubtless a correct statement, and being true we are unable to see why the estimated cost of construction, maintenance, and replacement may not be shown, as they must be considered in estimating the diminution in value caused by the extra fences." [2]

Tested by the foregoing principles the court is constrained to hold that the anticipated cost of installing the conveyor system was an element that the jury could properly con-

---

[2] Under present sec. 32.09 (6) (g), Stats., the cost of fencing "reasonably necessary to separate land taken from the remainder of condemnee's" except where this fencing is provided without cost to the condemnee is made an element of severance damages. This statutory provision was enacted long after the *Nowaczyk Case* was decided.

sider in determining the value of the remaining property after taking. Therefore, the trial court properly overruled the condemnors' objections to such testimony.

The condemnors point to other evidence which they contend disclosed a far less expensive way of getting the sand and gravel delivered into the block-manufacturing plant than installing an overhead conveyor. This argument has to do with the weight to be accorded the testimony relating to the conveyor, not its admissibility.

### Quotient Verdict.

The three expert witnesses who gave opinion testimony as to the value of Ken-Crete's premises before and after the taking were Bear, Pfennig, and Borgman. The latter, an employee of the American Appraisal Company, was called by the condemnors.

The before value testified to by these three witnesses was:

| | | |
|---|---|---|
| Bear | $200,000 | |
| Pfennig | 194,000 | |
| Borgman | 152,200 | |
| Average: | | $182,066.67 |

The after value testified to by them was:

| | | |
|---|---|---|
| Bear | $150,000 | |
| Pfennig | 133,000 | |
| Borgman | 143,000 | |
| Average: | | $142,283.33 |

The jury found the before value to be $182,000 or only $66.67 less than the average of the before value testified to by these three witnesses. However, the after value found by the jury was $139,000, which is $3,283.33 less than the average of the after values testified to by the three witnesses. This would strongly indicate that the jury arrived at its before value by taking such average and eliminating the odd dollars and cents. It is readily apparent, however, that

the jury could not have adopted such method in determining the after value.

There were two dissents to the verdict and after the verdict the condemnors requested the trial court to call the two dissenters and the foreman of the jury for the purpose of finding out whether or not the jury did use the "average" or "quotient" method in arriving at their verdict. The trial court refused to this relying on the rule that the testimony or affidavits of jurors will not be received to establish their own misconduct or to impeach their verdict. See *Olson v. Williams* (1955), 270 Wis. 57, 70, 70 N. W. (2d) 10; *Dishmaker v. Heck* (1915), 159 Wis. 572, 578, 150 N. W. 951; *Wolfgram v. Schoepke* (1904), 123 Wis. 19, 24, 100 N. W. 1054. The action of the trial court in this respect was clearly proper. In any event, in order to invalidate the instant verdict on the ground of it being an improper quotient verdict, there must be proof that the jurors bound themselves in advance to the quotient method of determining their answer to the before value. *Schiro v. Oriental Realty Co.* (1959), 7 Wis. (2d) 556, 564, 97 N. W. (2d) 385; *Pierce v. Chicago & M. E. R. Co.* (1909), 137 Wis. 550, 559, 560, 119 N. W. 297; Anno. 52 A. L. R. 41, 44. A verdict is not rendered bad merely because it is arrived at by the quotient method. *Schiro v. Oriental Realty Co., supra,* page 564.

*By the Court.*—Judgment affirmed.